**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LYONROSS PARTNERS MASTER FUND LP, SUSSEX DIRECTORIES SEZC, TIMBERDALE LIMITED, VLADIMIR KUZNETSOV, and THE PIERS PLAYFAIR RETIREMENT PLAN & TRUST, | Civil Action No. _____ |
| Plaintiffs, | **[SEALED] COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| PROPHECY TRADING ADVISORS INTERNATIONAL LTD, PROPHECY TRADING ADVISORS MASTER FUND, LP, PROPHECY ASSET MANAGEMENT LP, PROPHECY TRADING ADVISORS GP, LLC, JEFFREY SPOTTS, JOHN HUGHES, JOHN CARUSO and BRIAN KAHN, | |
| Defendants. | |

# TABLE OF CONTENTS

NATURE OF THE CASE ....................................................................................1

JURISDICTION AND VENUE ...........................................................................5

THE PARTIES......................................................................................................6

STATEMENT OF THE FACTS ...........................................................................9

    A.    Prophecy's False and Misleading Statements Prior to
           Plaintiffs' Investments ............................................................9

    B.    Plaintiffs Invest in Reliance on Prophecy's
           Representations ....................................................................15

    C.    Defendants' Continuing Misrepresentations and Plaintiffs'
           Continuing Reliance.............................................................16

    D.    Prophecy's Secret Off-platform Investments with Broad
           Reach and Kahn ...................................................................17

           1.    Prophecy's Hidden Off-platform Investment with
                  Broad Reach............................................................18

           2.    Kahn's Co-Dependent Relationship With Prophecy .................19

           3.    Kahn's Secret Side-Account Sucked $160M from
                  Prophecy, Largely to Build a Controlling and
                  Illiquid Position in FRG.........................................20

    E.    The Broad Reach Ponzi Scheme Comes to Light
           and Prophecy Lies to LyonRoss About Not Having
           Invested in It .........................................................................22

    F.    Kahn and Prophecy Cover Up Prophecy's
           Entanglement with Broad Reach ..........................................23

    G.    LyonRoss's Continued Investigation Reveals the
           Broad Reach Cover-Up.........................................................25

    H.    Prophecy's Massive, Secret Off-platform Investments with
           Kahn are Exposed .................................................................26

    I.    Its Off-platform Investments with Kahn Caused Prophecy
           to Over-Leverage the Funds and Left it Unable to Pay
           Redemptions .........................................................................29

J.  Prophecy Reveals That Its Auditor Had Resigned ................................................30

K.  Prophecy Improperly Suspends Redemptions .......................................................31

CAUSES OF ACTION ...........................................................................................................33

PRAYER FOR RELIEF ..........................................................................................................60

JURY DEMAND ......................................................................................................................62

Plaintiffs LyonRoss Partners Master Fund LP (the "LyonRoss Partners Fund"), Sussex Directories SEZC ("SDS"), Timberdale Limited ("Timberdale"), Vladimir Kuznetsov ("Kuznetsov"), and the Piers Playfair Retirement Plan & Trust ("PPRPT") (collectively, "Plaintiffs"), bring this action for damages and other legal and equitable relief against defendants Prophecy Trading Advisors International Ltd (the "Fund"), Prophecy Trading Advisors Master Fund, LP (the "Master Fund," and together with the Fund, the "Funds"), Prophecy Asset Management LP ("Prophecy"), Prophecy Trading Advisors GP, LLC (the "General Partner"), Jeffrey Spotts ("Spotts"), John Hughes ("Hughes"), John Caruso ("Caruso") (collectively, the "Prophecy Defendants"), and Brian Kahn ("Kahn"), (collectively with the Prophecy Defendants, "Defendants") for (i) violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder; (ii) violations of Section 20(a) of the Securities Exchange Act of 1934; (iii) common law fraud; (iv) aiding and abetting common law fraud; (v) civil conspiracy; (vi) negligent misrepresentation; (vii) breach of fiduciary duty; (viii) aiding and abetting breach of fiduciary duty; (ix) breach of contract; (x) negligence; and (xi) unjust enrichment, alleging as follows:

## NATURE OF THE CASE

1.      This is a case of fraud, breach of fiduciary duty, and conspiracy in which Defendants secretly diverted tens of millions of dollars of Plaintiffs' money to one man, Brian Kahn. That money was purportedly invested in a diversified risk-controlled structure, holding liquid assets. Instead, Kahn used it largely to accumulate a controlling shareholder position for himself in one small-cap public company, Franchise Group Inc. ("FRG"), where he is now President and CEO. Kahn acquired his concentrated, illiquid and risky FRG position through

Defendants' deceit and collusion, leaving Plaintiffs unable to recover a single dime of their investments.

2.      Spotts, Hughes, and Caruso ran an investment management firm known as Prophecy.  They induced Plaintiffs to entrust over $50 million to them by marketing Prophecy as a careful, risk-averse, "first-loss" money manager.  Prophecy's pitch was that it engaged dozens of sub-advisors to deploy investors' capital across a diverse set of liquid investments, using a proprietary platform designed and controlled by Prophecy to minimize losses (the "Platform").  Prophecy touted its first-loss structure, which controlled risk by requiring sub-advisors to put up their own funds, generally in the amount of 10% of the money received from Prophecy, as collateral to absorb the first losses on any of the Funds' investments.  Requiring its sub-advisors to maintain the Funds' investments on its proprietary trading Platform provided a further, crucial risk-control mechanism because it gave Prophecy itself the ability to liquidate sub-advisors' positions before serious losses were incurred.  These controls, Plaintiffs were told, made Prophecy a low-risk investment that highly-esteemed investors like Bain Capital considered tantamount to a cash alternative.

3.      During due diligence, various Defendants repeatedly emphasized three principles of the Funds' management: (i) liquidity, (ii) diversification (among both sub-advisors and positions), and (iii) risk-controls.  Prophecy officers Spotts, Hughes, and Caruso billed their fund as a stable and highly collateralized investment vehicle.  It was nothing of the sort.

4.      In fact, Prophecy had a years-long pattern of making and concealing illiquid investments and hidden soft loans (*i.e.*, loans that benefit the recipient with below-market terms) with undisclosed parties in direct contravention of its investment mandate.  Before and during Plaintiffs' investments with Prophecy, Defendants had secretly transferred significant capital into

an opaque investment fund managed by Broad Reach Capital ("Broad Reach"), which turned out to be a Ponzi scheme, and into soft loans with one sub-advisor, now known to be Kahn.

5.      The Broad Reach and Kahn arrangements had been ongoing for years before Plaintiffs invested in the Prophecy Fund and were precisely the kind of investments, and investment structures, that Prophecy claimed to avoid. Thus, they were allocations that Spotts, Hughes, and Caruso could not admit to their prospective investors, and specifically misrepresented to Plaintiffs.

6.      Prophecy disguised the nature of its exposure to Broad Reach, and conspired with Kahn to cover up the ensuing losses when Broad Reach defaulted on a redemption due to be paid in January 2019. To help Prophecy, Kahn *paid full value*—over $17.5 million—for Prophecy's redemption rights.  Then he agreed with Prophecy to back-date the transfer by over two months. Kahn's purchase for full value and back-dating of Prophecy's Broad Reach interest made no economic sense; its purpose could only have been to deceive Prophecy's investors by concealing the loss on this unauthorized investment.

7.      Kahn conspired with Prophecy to cover up its Broad Reach exposure not only because he too was obtaining disguised soft loans from Prophecy, but because Prophecy gave him access to a huge proportion of the Funds' capital.  Of the Funds' $363 million in capital as of January 2020, Khan and Prophecy together sucked $160 million into a fully hidden side account and $36 million into other hidden loans.  Eventually, 86% of Prophecy's capital was at Kahn's disposal, most of it – $196 million – completely hidden from Plaintiffs.  Kahn had used the majority of these Prophecy funds to accumulate his highly concentrated, illiquid position in FRG stock.

8.      Because so much of its capital was dedicated to Kahn's secret positions, Prophecy surreptitiously increased the leverage on its other investments in order to conceal the hidden transfers.  Prophecy replaced the secret $196 million allocation to Kahn, dollar-for-dollar, with covert leverage.  The combination of Kahn's diversion of the Funds' capital into concentrated, illiquid positions and Prophecy's high levels of leverage made the Funds unstable.  Now Kahn is either unwilling, or unable, to return Prophey's capital, and Prophecy, in turn, is either unwilling or unable to honor Plaintiffs' redemption from the Fund.

9.      There is no doubt Defendants' conduct is culpable.  Prophecy lied about Broad Reach and issued patently false written reports to Plaintiffs that omitted the $160 million in a secret side account with Kahn and $36 million in undisclosed soft loans to Kahn.  Further, and tellingly, Deloitte & Touche LLP ("Deloitte"), Prophecy's auditor, abruptly withdrew its prior year audit opinion apparently due to Prophecy's false reporting concerning Broad Reach, and resigned.  These actions by an auditor are a seismic event in the financial world that almost invariably signal wrongdoing.

10.      Kahn clearly conspired with and aided and abetted Prophecy, both by participating in the Broad Reach cover-up and by covertly taking Prophecy's investors' funds to make obviously unauthorized investments that he knew were not disclosed to investors.  Kahn was also unjustly enriched both by the money taken from the Funds and not repaid and by the value of his control premium in FRG, which was purchased in part with Plaintiffs' money.

11.      Despite Plaintiffs' valid and timely redemption requests, Prophecy also now stands in breach of its contractual obligations to return Plaintiffs' money.  Plaintiffs—all shareholders in the Funds—bring this action to recover their losses due to Defendants' wrongful conduct.

## JURISDICTION AND VENUE

12.     The claims herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), and under state and common law.

13.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa); 28 U.S.C. §§ 1331 and 1337; and principles of supplemental jurisdiction under 28 U.S.C. § 1367.

14.     Venue is proper pursuant to 15 U.S.C. § 78aa, because one or more acts or transactions constituting violations of the federal securities laws occurred in this District.

15.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

16.     This Court has personal jurisdiction over the defendants. The Fund and the Master Fund have significant contacts with New York, which is the principal place of business of their investment manager and general partner. Defendants Prophecy and the General Partner are Delaware entities that conduct significant ongoing business in New York and each maintain a principal place of business in New York. The individual defendants are principals, directors and/or affiliates of such entities, who conduct substantial ongoing business in New York.

17.     This case arises from misrepresentations Defendants Spotts and Hughes made in New York on behalf of Prophecy and the Funds, and that were received in New York by New York-based LyonRoss Capital Management LLC ("LyonRoss"), as agent for all Plaintiffs, and New York-based Plaintiff LyonRoss Partners Fund.

18.     The Defendants' acts caused injury to LyonRoss Partners Fund in New York.  All of the Defendants regularly do or solicit business in New York and should reasonably expect their acts to have consequences in New York, while deriving substantial revenue from interstate or international commerce.

## THE PARTIES

19.     At all relevant times, Plaintiff LyonRoss Partners Fund has been a shareholder in the Fund.  The LyonRoss Partners Fund initially invested $15 million in the Fund on February 1, 2019.  LyonRoss Partners Fund has its principal place of business in New York.

20.     Relevant non-party LyonRoss is an SEC registered investment advisor with its principal place of business in New York that serves as the investment manager for, and agent of, the LyonRoss Partners Fund.  LyonRoss maintains advisory clients, which are third-party investors such as family offices and other dedicated investment vehicles.  LyonRoss recommends investments to advisory clients under non-discretionary investment agreements. These advisory clients rely on LyonRoss to research and source investment opportunities, and then invest in certain opportunities alongside LyonRoss. All other Plaintiffs (except for PPRPT) are advisory clients of LyonRoss, which acted as agent for all Plaintiffs in connection with Prophecy and the Fund.

21.     Plaintiff SDS has been a shareholder in the Fund.  SDS initially invested in the Fund on or about February 1, 2019.  SDS is a Cayman company with offices in the Cayman Islands.

22.     Plaintiff Timberdale has been a shareholder in the Fund.  Timberdale initially invested in the Fund on or about February 1, 2019.  Timberdale is an investment holding company organized under the laws of Guernsey.

23.     Plaintiff Vladimir Kuznetsov has been a shareholder in the Fund.  Kuznetsov initially invested in the Fund on or about August 1, 2019.  Kuznetsov is an individual who resides in Switzerland.

24.     Plaintiff PPRPT has been a shareholder in the Fund.  PPRPT is a New York retirement trust for the benefit of Piers Playfair, a principal of LyonRoss, which initially invested in the Fund on or about February 1, 2019.

25.     The Fund is an open-end investment company having a place of business in Lynlex Chambers, P.O. BOX 4408, Road Town, Tortola, British Virgins Islands.  The Fund is managed from New York by Prophecy.  New York is the primary place of business for operating and marketing decisions for the Fund, and the Fund solicits investors in New York.  According to Prophecy's representations, the Fund invests all of its investable assets in the Master Fund, subject to oversight by the board of directors of the Fund.  The Fund has only two directors to supervise and oversee its activities—Defendant Jeffrey Spotts, a Prophecy principal, and Thomas H. Davis, the sole outside director, who is based in Bermuda.  The Fund is managed from New York by Prophecy.  Between February and November 2019, Plaintiffs collectively invested approximately $52 million in the Fund.

26.     The Master Fund is a Cayman Islands limited partnership that was formed for the purpose of investing and trading in securities and financial instruments.  The Master Fund is managed from New York by Prophecy.

27.     Defendant Prophecy is a Delaware limited partnership and a registered investment adviser that serves as investment manager to the Fund and the Master Fund.  Prophecy's principal place of business is New York.  Defendants Spotts and Hughes are principals of

Prophecy.  According to diligence materials provided by Prophecy, in May 2018 it was advising funds with over $500 million of regulatory assets and $232 million of capital.

28.     The General Partner is a Delaware limited liability company that serves as the general partner of the Master Fund.  The General Partner has its principal place of business in New York.  Defendants Spotts and Hughes are members and principals of the General Partner.

29.     Defendant Jeffrey Spotts is the chief executive officer, portfolio manager, and founder of Prophecy.  According to Prophecy's representations, Spotts is a director of the Fund and a principal of Prophecy.  Upon information and belief, Spotts resides in New Jersey. Further, upon information and belief, at all relevant times, Spotts managed Prophecy and the Fund from New York.

30.     Defendant John Hughes is the president of Prophecy.  Upon information and belief, Hughes resides in New Jersey.  Further, upon information and belief, at all relevant times, Hughes managed Prophecy and the Fund from New York.

31.     Defendant John Caruso is the chief risk officer of Prophecy.  Upon information and belief, Caruso resides in Charleston, South Carolina, and transacts substantial business in New York.  As the chief risk officer of New York-based Prophecy, Caruso participated in meetings and phone calls with New York-based investors, including LyonRoss Partners Fund.  Caruso conspired with New York-based Defendants Prophecy, Spotts, and Hughes to defraud and otherwise injure Plaintiffs.

32.     At all relevant times, Defendant Brian Kahn was engaged by Prophecy as a sub-advisor to the Funds with the largest allocation of the Funds' assets.  Kahn is the CEO and President of FRG, a publicly listed company whose business lines include Liberty Tax Service, Buddy's Home Furnishings, Sears Outlet, American Freight and The Vitamin Shoppe.  FRG currently operates over 4,400 locations predominantly located in the U.S. Upon information and

-8-

belief, Kahn resides in Florida and transacts substantial business in New York.  Kahn conspired with New York-based Defendants Prophecy, Spotts, and Hughes to defraud and otherwise injure Plaintiffs.

## STATEMENT OF THE FACTS

**A.      Prophecy's False and Misleading Statements Prior to Plaintiffs' Investments**

33.      In August 2018, LyonRoss was seeking to build stable, long-term relationships with trusted alternative investment managers.  Specifically, it was looking for managers that employed niche strategies to offer attractive risk-return profiles and relatively low correlations to equity markets.  LyonRoss sought to obtain single-digit returns with relatively low levels of volatility—and an emphasis on capital preservation.  Based on these criteria, it was introduced to Prophecy.

34.      On behalf of all the Plaintiffs, LyonRoss began conducting thorough due diligence into Prophecy and its offerings in August 2018.  This due diligence included, *inter alia*, numerous direct communications with and requests for information from Prophecy, as well as third-party research and calls with numerous service providers, references, and peer firms to corroborate Prophecy's representations and reputation.

35.      Prophecy, and Spotts in particular, described its Funds as employing a "first-loss multi-manager strategy," meaning that the Funds' assets would be managed by a number of sub-advisors, each of whom placed their own cash as collateral in an escrow account with Prophecy that could be used to cover any losses suffered by the individual manager.  Prophecy also claimed to employ strict risk control measures, including a requirement that sub-advisors trade through Prophecy's Platform, which allowed Prophecy to monitor its managers' trading strategies and, if necessary, directly liquidate holdings in each manager's account.  Prophecy

represented that its success depended in part on controlling losses by maintaining the ability to prevent each sub-advisor on the Platform from executing risky trades that could exhaust its collateral with Prophecy. According to Prophecy, when sub-advisors incurred losses approaching the amount of their collateral accounts, Prophecy had the unilateral ability to step in and liquidate their positions—a risk mitigation strategy predicated on the sub-advisors' investing only in highly diversified, liquid assets, using the Prophecy Platform.

36.     Prophecy entered into agreements with each of its sub-advisors that were supposedly intended to generate consistent returns for the Funds while minimizing downside risk. Under these agreements, each sub-advisor agreed to pay the Funds a small percentage, typically around 2%, of the assets allocated to it by Prophecy, referred to as an "administration fee," for the right to access and invest the Funds' capital. In exchange, the sub-advisors were typically permitted to retain a substantial portion of the profits generated by their investments, with the remainder flowing to the Funds. These agreements included restrictions on the size of a stock position relative to its trading volume: "No single position may exceed 15% of the average daily trading volume over the previous 45-day period."

37.     Over the last nine years, this strategy appeared to translate into a steady, reliable rate of return with little downside risk for Prophecy's investors, seeming more akin to a liquid cash alternative than a fluctuating return based on variable market performance. Indeed, Prophecy reported that, prior to Plaintiffs' investment, the Funds had not experienced a single monthly loss over the prior eight years.

38.     Prophecy touted the blue-chip firm Bain Capital as one of its "lead investors." Bain is famous for its prudence and relentless due diligence, and Prophecy told LyonRoss that Bain considered the Funds so low-risk as to be essentially a cash alternative.

39.     Prior to Plaintiffs' investments, Prophecy's oral representations and written materials repeatedly stressed three things about its investment approach: (i) liquidity; (ii) diversification; and (iii) risk controls.  For example, in Prophecy's Due Diligence Questionnaire ("DDQ") provided to LyonRoss along with other offering documents, Prophecy represented that its investment strategy involved providing capital to a "diverse" set of sub-advisors that trade exclusively in liquid assets, such as "listed US equities, liquid global equities and options."

40.     Asked to describe "the firm's basic trading strategies," Prophecy represented that: "The firm assets are deployed via sub-advisor in discretionary and systematic management strategies, in **liquid equity markets** on a long/short basis" (emphasis added.)

41.     Describing its investment philosophy, Prophecy stated:

> We are not sector or style specific in our selection process.  We are interested in strategies that are process driven, that **traffic in liquid equities**, that have a record of **acceptable downside volatility and exposure**, and that are **consistently profitable**.  (Emphasis added.)

42.     In its response to the questionnaire, Prophecy represented that it "monitor[s] strategies [of its sub-advisors] to ensure they remain diversified across the aggregate of the funds positions," and stated that it would only engage sub-advisors that "have a clearly defined strategy that fits within the overall framework of the fund."

43.     In its materials, Prophecy explained that investor capital is "allocate[ed] to sub-advisors via structured arrangements in separately-managed accounts" and that "[t]hese allocations are **supported by cash deposits** provided by each sub-advisor or third-party investor" which "**serve as the primary downside risk protection** for the fund."  (Emphasis added.)

44.     When asked: "How does the firm react if the volume and or open interest of a market in which a position is held are suddenly reduced significantly?"  Prophecy responded in

its DDQ: "Our allocation methodology allows us to avoid that scenario by onboarding strategies that **invest in only the most liquid securities**." (Emphasis added.)

45.    Prophecy explained that the combination of its trading platform paired with the liquidity of the positions taken by sub-advisors accomplished significant downside risk protection:

> **3.21 How would the firm approach sudden and unexpected illiquidity in any of the markets traded?**
>
> Sub-advisor positions are mostly in liquid markets. Almost all positions across the fund can be **liquidated in less than a day without significantly impacting prices. Prophecy maintains liquidity restrictions for all sub-advisors.** Should the liquidity of a market change, they would be required to reduce exposure on the affected position. (Emphasis added.)
>
> **7.0 Describe the firm's overall risk management and approach?**
>
> There is a multi-level approach to risk management:
>
> First, the structure of the first-loss program is conducive to attracting sub-advisors with their own conscious risk-avoidance thought process. Sub-advisors bear the risk of losses from their trading, and they, or a third party, provide a deposit as collateral against those losses.
>
> Second, our dedicated risk operation monitors all trading activity through the EMS systems [i.e., the Platform, or "execution management system"] to ensure that sub-advisors do not exceed their trading allocation parameters. These allocation parameters are hard-coded into the EMS and will prevent any subadvisor from entering an order that violates the settings.
>
> Third, our risk operation monitors all trading in a real-time risk system that captures all activity, calculates profit and loss, and enables the performance of stress tests on positions. There are three full time risk managers monitoring the portfolios throughout the day in real time.

46.    Defendant Caruso was in charge of Prophecy's risk management and responsible for implementing the above approach. Due to his position, Caruso was responsible for knowing

and had a duty to monitor all of Prophecy's positions.   And indeed, he ran Prophecy's book of investments from a computer terminal with real time visibility and on every position, every sub-advisor and every trade executed on the Platform.  He knew how much capital was being allocated to each sub-advisor, the profits and losses of each sub-advisor, the allocation of the Plaintiff's capital to Kahn and the leverage being used to fund the Platform investments.

47.     On October 5, 2018, LyonRoss representatives attended a Prophecy "risk webinar."  During that webinar, Spotts and Caruso confirmed the following representations (among others) regarding investments in the Funds:

- "Maximum position value is generally no greater than 8% of subaccount allocation;"

- "Maximum loss protections include an alert to risk management at Prophecy to consider closing the account after 50% of deposit balance is gone;"

- "Prophecy monitors the sub-account strategies to ensure they remain diversified across the aggregate of the Funds' positions;"

- "Prophecy employs 2-3x times leverage;"

- "Most sub-advisors make use of stop-loss orders in their portfolios to limit downside risk. In the vetting process, Prophecy favors sub-advisors who make use of stop-loss levels in their process.  If an individual sub-advisor's portfolio violates a daily stop-loss limit or if the collateral deposit amount declines to an unacceptable level, the portfolio may be liquidated; and"

- "[T]he Prophecy risk operation would hedge any significant exposure for individual positions."

48.     During diligence, LyonRoss analysts noticed a reference to "loans" Prophecy had invested in during 2017.  As a category, loans appeared at odds with the investment strategy of holding liquid positions on Prophecy's Platform.  On a November 26, 2018 call, LyonRoss asked Spotts about the loans.  Spotts explained that Prophecy made these loans when they did not have the operational capability to manage certain strategies through the execution management system

of their transparent Platform (such as specialized dividend arbitrage strategies or option trades). In such cases, Prophecy lent money to sub-advisors to make so-called "Off-platform" investments.

49.     Spotts represented that Prophecy offset their reduced ability to control risk in Off-platform positions by insisting upon *full position-level transparency* into the underlying securities being traded.  They were all low-risk trading strategies with limited downside.  There were no commingled funds or limited partnerships, which are inherently less liquid and lack transparency.  Spotts minimized the relative significance of the Off-platform positions and said that they constituted less than 5% of the Funds' gross assets.  In a similar call on December 7, 2018, Spotts reiterated his previous representations and added that Prophecy only made such Off-platform allocations to strategies with "arbitrage-like qualities and low downside."

50.     Plaintiffs relied on these representations about Prophecy's Off-platform positions, which were recited in LyonRoss's investment memorandum, the document through which LyonRoss sought and was granted authority to invest with Prophecy by its investment committee.

51.     But these representations were lies.  In fact, during 2018, while diligence was ongoing, the Funds had made $46 million in loans to Kahn that were completely undisclosed when Plaintiffs decided to invest.  Prophecy then also held an undisclosed $24 million investment in the Broad Reach fund, into which it had no "position level transparency" at all.

52.     In January 2019, two LyonRoss analysts conducted an on-site due diligence meeting at Prophecy's Charleston office.  Spotts, Hughes and Caruso were all present.  At this meeting, LyonRoss reviewed the holdings of the various sub-advisors for the Funds and inquired about a particular sub-advisor with a larger allocation than the others (whose name was not

disclosed at the time, but who later turned out to be Kahn).  Spotts stated that this was a very wealthy money manager with sufficient cash deposited as collateral for any losses on his investments, which were all managed on Prophecy's platform.  Spotts also represented that this sub-advisor was well-diversified because he employed six other managers beneath him who were managing part of his overall allocation and that allocations to his account would be decreasing over time to avoid concentration.  As events later revealed, however, the reality was once again quite contrary to Prophecy's representations.

53.     Defendants Spotts, Hughes and Caruso made the foregoing statements, or caused them to be made, on behalf of the Prophecy Defendants in their capacity as principals and officers of Prophecy and the General Partner.  Defendant Spotts also made the foregoing statements, or caused them to be made, on behalf of the Funds in his capacity as a director of the Funds.  LyonRoss, in turn, received all of these representations on behalf of all Plaintiffs.

**B.     Plaintiffs Invest in Reliance on Prophecy's Representations**

54.     In reliance on Prophecy's representations, on February 1, 2019, LyonRoss made an initial investment of $15 million in the Fund.  In the following months, LyonRoss increased its investment with $5 million subscriptions on each of April 1 and May 1, 2019, for a total of $25 million as of May 1.  In reliance, *inter alia*, on the DDQ and other foregoing representations given to LyonRoss by Prophecy, the remaining Plaintiffs committed funds to Prophecy between February 1 and November 1, 2019, with Plaintiffs collectively investing $52 million with Prophecy.

55.     Each Plaintiff executed a contract with Prophecy in the form of a Subscription Agreement in connection with its investment in the Fund.  The Subscription Agreements incorporated the terms of a 2018 Private Place Memorandum ("PPM") offering shares in the

Fund. Thus, the Subscription Agreements provided that investors could redeem their shares on 60 days' notice, in contrast to many other private investment funds, which often include long lock-up periods preventing or limiting redemptions. Indeed, as alleged above, Prophecy had represented that "almost all" of the positions in the Funds could be "liquidated in less than a day."

### C.  Defendants' Continuing Misrepresentations and Plaintiffs' Continuing Reliance

56.     Between February 2019 when Plaintiffs first invested, and January 2020 when Plaintiffs submitted their full redemption requests, LyonRoss, on behalf of all Plaintiffs, continued to communicate with Prophecy regularly and monitor Plaintiffs' investments. Throughout the period that Plaintiffs were invested in the Fund, LyonRoss held monthly calls and received various reports from Prophecy. All of these indicated that the Funds' investments were generally consistent with the purported diversification and liquidity of the Funds.

57.     LyonRoss made additional inquiries about the Funds' allocation to its largest sub-advisor and asked to see the holdings in that account. In February 2019, Spotts provided position-level detail as of year-end 2018 for the sub-advisor (who was Kahn, although he was not identified by name). The detailed report showed that Kahn managed a diversified, well-hedged portfolio, consistent with past statements. Spotts also confirmed by email that Kahn's allocation included six different strategies managed by traders he selected. The report did not reveal any Off-platform loans or positions with Kahn.

58.     To the extent Off-platform investments were disclosed on monthly update calls by Prophecy, the number of sub-advisors, the underlying strategies and amounts of those investments were also generally consistent with Prophecy's putative approach. To the extent Prophecy mentioned Off-platform investments with Kahn, they were described, falsely and

-16-

misleadingly, so as to misrepresent their true size and nature—at times falsely indicating such positions were fully covered by a cash deposit that dwarfed the positions themselves and at other times indicating that such positions were no more than $10 million in size.  To the extent the Funds indicated Off-platform investments over 5% of its gross assets, LyonRoss was falsely led to believe that this was due to short-term allocations to very low-risk arbitrage strategies.

59.    LyonRoss and its advisory clients continued to maintain their investments with Prophecy and increase their subscription amounts in reliance on the foregoing misrepresentations.

**D.    Prophecy's Secret Off-platform Investments with Broad Reach and Kahn**

60.    Flatly contradicting its representations, Prophecy had a longstanding practice of making undisclosed Off-platform soft loans and buying illiquid, opaque fund participations that violated its professed investment approach and belied its specific representations to Plaintiffs.

61.    In addition to simply misrepresenting and failing to disclose these improper investments, the Prophecy Defendants also made attempts to conceal the true character of the investments by redeeming them at year-end and then re-instating them in the new financial year. By doing so, the investments would be reported on the Balance Sheet of the Funds' financial statements only as 'Receivables', thereby giving analysts the impression that the 'investments' were one step away from being cash.  By redeeming at year end, Prophecy avoided having to supply any detail about the investments' underlying nature—did they differ from Prophecy's investment mandate, were they long or short term, were they with third parties, what was their financial yield, what was their structure, were they performing?  None of this had to be disclosed if the investments were sold by December 31st, of any given year, and then added back in the following year.  And had the investments been held on the Balance Sheet at the year end, the

auditor would be required to describe the assets correctly.  Such accounting manipulation is a deceptive practice known as "window dressing."

### 1. Prophecy's Hidden Off-platform Investment with Broad Reach

62.     Spotts and Hughes had a longstanding and close relationship with Brenda Smith ("Smith"), the principal of Broad Reach Capital, L.P. ("Broad Reach").  Indeed, Smith had helped Spotts and Hughes set up a different Prophecy fund, known as Prophecy Alpha, and had served as an officer of that fund.

63.     During initial diligence, Prophecy mentioned to LyonRoss analysts in passing that a manager known as Broad Reach had been a sub-advisor to the Funds in connection with one specific transaction made using a separate account.  Unbeknownst to LyonRoss, Spotts and Hughes purposefully omitted any indication that the Funds had a much closer and broader relationship with Smith and Broad Reach.  Indeed, at that very time, Prophecy was investing *directly* into the Broad Reach investment fund without any transparency whatsoever into Broad Reach's underlying investments—transparency that Prophecy had claimed was the *sine qua non* of its Off-platform investments.  That Prophecy was blind to Boad Reach's underlying assets is obvious because Broad Reach was a Ponzi scheme, holding assets far different from those it was supposed to—which anyone who really had transparency into it would immediately have seen.

64.     Prophecy had made an Off-platform investment in the Broad Reach investment fund in January 2017 and then hidden it from its own investors by window dressing over at least two year ends, 2017 and 2018.  Prophecy's investment grew to $24 million during 2018, $17.5 million of which Prophecy was unable to redeem at the end of 2018, as described in Section E below.

-18-

### 2.    Kahn's Co-Dependent Relationship With Prophecy

65.    Brenda Smith's Broad Reach fund, was not the only sub-advisor for which Prophecy was window dressing investments or loans to conceal them from their investors. Spotts also had a longstanding and close relationship with Brian Kahn, whom Spotts described as being "like a brother" to him. Kahn had acted as a sub-advisor for Prophecy since the beginning of the Funds, and was consistently the Prophecy sub-advisor with the largest allocation. Prophecy had routinely provided marketing and fundraising assistance to Kahn at zero cost—an arrangement that apparently helped generate significant profits for Kahn (but with no discernible benefit for the Funds).

66.    During the time that Plaintiffs were invested in the Fund, it was disclosed that one sub-advisor (eventually identified as Kahn) managed somewhat over 50% of the Funds' assets on Prophecy's transparent execution management Platform. At various times, Spotts and Hughes represented that this allocation was being decreased but was already diversified due to Kahn's use of approximately six sub-managers. These Platform positions were diverse, liquid, hedged and conservatively levered through a relationship with Prophecy's prime broker.

67.    But Prophecy had also been making undisclosed soft loans to Kahn for years, which (as Spotts eventually admitted) Prophecy and Kahn would redeem shortly before the end of each fiscal year so the positions would not appear on the Funds' year-end financial statements. The pattern of window-dressing Kahn's financial relationship was similar to Broad Reach: redeem before year end, and then when the next year began, Kahn and Prophecy would reverse course and reinstate the loans.

68.    As it now admits, "Prophecy had entered into a number of agreements with [Kahn] which include collateral arrangements, personal guarantees, subscriptions, and short-term loans." These undisclosed transactions with Kahn occurred *in addition* to Prophecy's large

disclosed positions with Kahn as its largest sub-advisor.  As it turned out, and unbeknownst to investors, $312 million or *86% of the Funds' $363 million* in capital eventually wound up in Kahn's hands, of which $196 million was kept completely secret from investors in a secret side account of $160 million (described immediately below) and hidden loans of at least $36 million ($160+$36=$196).

69.     The pattern of hiding Kahn's Off-platform positions from investors extends back to at least 2017 and involved collusion because Kahn was a counterparty to the year-end redemption and reinstatements, and was aware that such behavior would be opaque to Prophecy investors.

### 3.    Kahn's Secret Side-Account Sucked $160M from Prophecy, Largely to Build a Controlling and Illiquid Position in FRG

70.     In the latter half of 2019, Kahn needed money.  Lots of it.  Kahn had turned his focus to building a controlling position in a small public company, FRG (formerly known as Liberty Tax/TAXA) by buying shares personally, or through vehicles he owned and controlled. He then used FRG, as a roll-up vehicle to acquire several retail franchise businesses, including The Vitamin Shoppe, American Freight and Sears Outlet.

71.     Kahn increased his FRG position exponentially from approximately 2 million shares (14.8%) on May 16th 2019 to more than 15 million shares (53.11%) on January 3rd, 2020. The total cost of Kahn's purchases of FRG shares between May 2019 and January 3rd, 2020 would have been roughly $200 million.

72.     Finding $200 million for a speculative investment of this kind in FRG would be virtually impossible in any market.  But during the latter part of 2019, Kahn obtained what he needed from Prophecy.  Secrecy was essential because Prophecy could not justify to its investors or Plaintiffs, under any circumstances, making this kind of investment.  It was Off-platform;

there was no cash guarantee; there was no first-loss provision; it was illiquid and—by orders of magnitude—far too concentrated. In fact, by virtually any standard that Prophecy had articulated, its huge, undisclosed allocation to Kahn was the very opposite of what it had led Plaintiffs to expect.

73.     To conceal this stark betrayal of its investment thesis, Prophecy and Kahn agreed to set up a secret side account into which they funneled over $160 million. Prophecy's reports to LyonRoss blatantly misrepresented the Funds' investments by concealing this secret side account.

74.     As Hughes finally confessed in January 2020, Kahn used "well over $100 million" of these side-account funds to buy FRG shares. Indeed, Kahn himself has recently admitted that he "owed" Prophecy money to amass a controlling number of FRG shares. He thus exploited his access to Prophecy's capital to build a huge interest in FRG, and he used Plaintiff's money to capture a control premium that he and his private equity fund would enjoy.

75.     Kahn's investments in FRG are highly illiquid. During the second half of 2019, the average daily trading volume was no more than 40,000 shares per day, or well under $1 million by dollar value. But Kahn accumulated a block of *15 million* shares valued as of August 2020 at approximately $380 million, a completely illiquid position considering the company's small size and typical trading volume. Even if Kahn or Prophecy wanted to liquidate Kahn's controlling position in FRG, it could not: there is no market for that volume of shares.

76.     Further, Kahn recently admitted that FRG's other lenders did not know of his secret account with the Funds, and that if they found out that Kahn had taken on additional undisclosed debt backed by FRG shares, they could very well seek to accelerate repayment of FRG's debts. Kahn indicated that FRG's lender agreement contained a change-of-control

provision, meaning that if Kahn's ownership of FRG fell below a certain high percentage, the lenders could accelerate repayment of their loans, and thereby dramatically diminish—if not destroy—the value of the company, rendering Kahn's position in FRG effectively worthless and utterly illiquid. Therefore, Kahn could not sell shares in the company to generate sufficient liquidity for Prophecy without risking acceleration of FRG's debt and likely bankrupting the company.

77.     Defendants knew full well they were deceiving and betraying Prophecy's investors: No first-loss fund makes the slightest sense if the majority of its assets are concentrated, illiquid and not actually subject to first-loss protection at all. Naturally, as set forth below, Plaintiffs sought to escape the Fund as soon as they learned the truth in January 2020—but by then Defendants' misconduct had already rendered that impossible.

### E.     The Broad Reach Ponzi Scheme Comes to Light and Prophecy Lies to LyonRoss About Not Having Invested in It

78.     In August 2019, LyonRoss learned through public reports that Brenda Smith, the founder of Broad Reach, had been arrested and indicted for securities fraud. Authorities alleged that Smith operated Broad Reach as a Ponzi scheme. According to the indictment filed by federal prosecutors, Smith "knowingly and intentionally devised . . . a scheme and artifice to defraud" pursuant to which she made "misrepresent[ations] to investors" and "[i]nstead of investing the money as SMITH advertised, she diverted tens of millions of dollars of investor funds . . . [and] [paid] out millions of dollars to other investors."

79.     Because Broad Reach had been mentioned during diligence, LyonRoss contacted Prophecy to confirm their understanding that Prophecy had not invested any of Plaintiffs' capital into the Broad Reach fund at the center of the Ponzi scheme.

80.     On August 27, 2019, Spotts wrote to LyonRoss:

Yes, they were the sub-advisor for the dividend skate trade. **We are not in that fund** and ran the trade through her broker dealer-introduced account at ICBC. Subsequently, we have hired away her trader, Jason Ferrari, that actually ran the strategy and we have a direct account at ICBC. **We are not impaired by this event**. (Emphasis added.)

81.    This statement was false and misleading because Prophecy, had, in fact, invested directly in the Broad Reach investment fund, rather than "through [Smith's] broker-dealer."

82.    Spotts repeated this lie the following day on a call with two LyonRoss representatives, claiming, that Prophecy had not had exposure to the Broad Reach fund, but instead had had exposure only through Broad Reach's broker-dealer side.

83.    Three months later, in November 2019, LyonRoss received a call from another Prophecy investor who was alarmed because he had learned that Prophecy had invested directly into Broad Reach's investment fund.

84.    LyonRoss again immediately contacted Spotts. During a call with three LyonRoss representatives, on or about November 15, 2019, Spotts admitted that, in fact, Prophecy *had* made an investment in the Broad Reach investment fund.

85.    Spotts then claimed that Prophecy had fully redeemed the investment at year-end 2018 and therefore had suffered no losses whatsoever.

**F.    Kahn and Prophecy Cover Up Prophecy's Entanglement with Broad Reach**

86.    Prophecy's story about having received full payment for its year-end 2018 redemption from Broad Reach was a lie. Prophecy received only a fraction of the funds it was owed by Broad Reach.

87.    To disguise the existence of the investment in Broad Reach from investors and to hide the default on the redemption, Prophecy and Kahn entered into a sham transaction. Prophecy had requested a redemption of its entire investment of $24 million in Broad Reach in

December 2018, to avoid disclosing its interest in the Broad Reach fund in Prophecy's year-end audit. But by April 2019, Prophecy had received only $6.5 million. Knowing that the Broad Reach investment would appear in the Funds' audited financial statements, Prophecy sold the outstanding $17,579,885.15 million receivable from the redemption to Kahn in June 2019—*for full value*.

88.     This undiscounted transaction made no economic sense: no rational investor would purchase at full value a months-old redemption right for payment from an investment fund (Broad Reach) that had already failed to honor the redemption.

89.     Kahn is no stranger to understanding the value of past-due receivables. He is CEO of major US retail operations including American Freight and Sears Outlet that excel at providing value on discounted furniture to Americans. And many American Freight and Sears Outlet customers purchase furniture on credit. Kahn therefore well understands that a customer receivable from, say, a sofa that is 180 days past due is not at all the same thing as cash.

90.     As to timing, Kahn paid Prophecy for its unredeemed Broad Reach interests in June 2019, right before Deloitte concluded its 2018 financial audit. Then Kahn and Prophecy dated the assignment so as to appear to have occurred on April 1, 2019.

91.     Having completed the sham transaction, Prophecy and Kahn then tried to cover up their involvement. Spotts's call and email in August 2019, denying to Plaintiffs' that Prophecy was in Broad Reach, which was a bald-faced lie, made all the more brazen given what had just occurred in June. And despite Prophecy's volte-face on November 15th, 2019, Kahn was not disclosed to Plaintiffs as the "buyer" of the redemption rights until January 2020.

92.     That this Prophecy-Kahn receivable transaction was improper—and designed to mislead investors—was later confirmed by Deloitte's withdrawal of its 2018 audited financial statements and its resignation as the Funds' auditor.

### G.     LyonRoss's Continued Investigation Reveals the Broad Reach Cover-Up

93.     Upon learning in November 2019 that Prophecy had in fact been invested in the Broad Reach investment fund after all, LyonRoss became concerned and probed further. It conducted a number of follow-up meetings and calls with Prophecy from late November 2019 to January 2020. Prophecy appeared to be cooperating with LyonRoss and provided assurances that the Funds would be managed as had been represented going forward, and also that LyonRoss and its investors would suffer no losses as a result of the Broad Reach investment.

94.     Not suspecting a far bigger problem, LyonRoss's focus during this period was on trying to ensure that Plaintiffs would not be damaged by Prophecy's participation in Broad Reach.

95.     LyonRoss nevertheless inquired about any other Off-platform investments fearing there may be other Broad Reach-like fund investments lurking. LyonRoss received assurances that any Off-platform investments were reasonably cabined because they were abundantly collateralized against loss, had very low downside risk because of their arbitrage-like nature, and/or were small in size.

96.     During this period—and before Plaintiffs were informed that Kahn had been involved in the Broad Reach sham—Spotts mentioned Off-platform positions with Kahn, but variously indicated that these were five times overcollateralized by Kahn's cash deposit with Prophecy or limited in size to $10 million.

97.     Spotts repeatedly promised to make no more material Off-platform loan or fund investments, at one meeting actually raising his right hand and pledging his "scouts honor."

98.     LyonRoss thus sought to ensure that Plaintiffs were not damaged by claw-backs in connection with the Broad Reach Ponzi scheme.  In January 2020, to assure LyonRoss that any such exposure to claw-backs was limited, Prophecy admitted that over $17.5 million of its purported redemption from Broad Reach had not been paid by Broad Reach at all but that its redemption rights had been purchased by a "third-party."  LyonRoss pressed further, and Spotts revealed that the purported third-party was not a third-party at all:  it was actually Kahn.

99.     LyonRoss then asked what discount Kahn had received for buying a defaulted receivable.  It was told that he paid full value.

100.    LyonRoss was puzzled and also concerned that Kahn would sue Prophecy for selling him a defaulted receivable from a Ponzi scheme at full value.  LyonRoss demanded a call with Kahn and asked him to release Prophecy from any liability for the Broad Reach receivable.

101.    Unaccountably, and despite having been stuck with a $17.5 million debt from a Ponzi scheme, Kahn readily agreed to a broad release.  Spotts tried to assuage LyonRoss's obvious suspicions by explaining that he and Kahn "were like brothers" and therefore that Kahn would never sue Prophecy and was untroubled by providing a release.

102.    This made no sense.  LyonRoss suspected a *quid pro quo* for Kahn's bizarre willingness to accommodate Prophecy—and soon discovered that that there was one.

**H.     Prophecy's Massive, Secret Off-platform
         Investments with Kahn are Exposed**

103.    By mid-January 2020, LyonRoss was deeply concerned about the integrity of Prophecy and their entanglement with Kahn and realized it needed to re-underwrite Plaintiffs' entire investment with Prophecy or redeem it.

-26-

104.    Tim Bliss ("Bliss"), a LyonRoss analyst demanded a precise report of all of the Funds' positions.  Prophecy eventually provided the exposure report on January 22, 2020 that *purported to show 100% of the Funds' assets* as of January 17, 2020.  This report indicated a relatively diversified, liquid pool of assets in keeping with Prophecy's advertised investment approach – and *showed that less than 10% of the Funds' assets were Off-platform*.  However, in Spotts's cover email attaching the January 17th position report he revealed for the first time that the last three allocations were for Brian Kahn's deals.  The three loans were for $20.25 million, $13 million and $3 million ($36.25 million in total) and were the only Off-platform positions listed in the report.  Given Kahn's involvement with Broad Reach, LyonRoss dispatched Bliss to South Carolina to meet with Prophecy in person and fully re-underwrite the entire Prophecy portfolio (both on and Off-platform positions).

105.    During a meeting between Bliss and Hughes on January 28, 2020 Bliss dramatically discovered Prophecy's secret $160 million side account with Kahn and another $36 million in hidden soft loans to Kahn.

106.    Bliss had brought the January 17th 2020 exposure report to the meeting with Hughes on January 28, 2020 to verify it.  However, at the meeting, Bliss caught Hughes with a copy of a holdings report that was starkly different from Spotts's January 17, 2020 report.  Bliss noticed that Hughes's version of the report had two extra line items.  Hughes explained that the two line items, amounting to $36 million (one loan for $19 million and another for $17 million— $19+$17=$36) were both hidden investments with Kahn in Off-platform special purpose vehicles, to which "Prophecy provided capital at a fixed rate of return."

107.    Bliss probed further, wanting to ensure that the overall liquidity of Prophecy's portfolio had not significantly deteriorated.  Bliss asked Hughes to provide the equity balances in

the Funds' three prime brokerage accounts and bank account. Hughes initially resisted, saying Prophecy did not regularly provide that level of transparency. But Bliss insisted. Reluctantly, Hughes checked each balance and indicated approximately $105 million of prime brokerage equity balances across the Funds' accounts and approximately $15 million in its bank account amounting to total capital of $120 million ($105 + $15 = $120).

108.    Because the known capital of the fund was $363 million, Bliss immediately calculated that there was money missing. Hughes finally revealed that there was in fact an additional secret account jointly owned by Prophecy and Kahn that contained approximately $160 million of capital, including well over $100 million of FRG stock.

109.    When Bliss asked how the Funds came to have such a large position without disclosing it, Hughes blamed Spotts for getting in over his head and not thinking through the ramifications of deals. Hughes also admitted there was no cash deposit supporting this position.

110.    Bliss also spoke to Caruso to verify the Funds' Platform trading positions, and particularly Kahn's allocations. On Caruso's computer screen, Bliss saw over $100 million of positions, in Kahn's account, in thinly traded, small cap stocks, including a significant *additional* FRG position of over $45 million.

111.    This meant that Kahn had taken hostage to at least half the capital of the Funds to purchase his controlling interest in a single small-cap illiquid company. Hughes also admitted to Bliss the obvious: the Funds' arrangements with Kahn and their position with FRG was extremely concentrated.

112.    These revelations belied Prophecy's entire investment premise, as well as all of Defendants' representations and reports concerning what it had been doing with Plaintiffs' money.

113.    Accordingly, Plaintiffs immediately submitted complete redemption requests, seeking to exit the Fund and recover their money.  These redemptions should have paid within 30 days of March 31, 2020, but, as set forth below, they were not honored and Plaintiffs have yet to receive any of their money.

**I.      Its Off-platform Investments with Kahn Caused Prophecy to Over-Leverage the Funds and Left it Unable to Pay Redemptions**

114.    Prophecy's $196 million of secret investments with Kahn were not only concentrated and illiquid, but also destabilized the portion of the fund for sub-advisors using Prophecy's transparent execution management Platform.  Prophecy's secret and Off-platform transfers to Kahn alone now totaled 54% of the capital (or $196M/$363M=54%), dramatically higher than the 10% represented in the Jan 17, 2020 exposure report.

115.    Allowing Kahn to remove so much of the capital from Prophecy's on-platform business created an existential problem.  Prophecy needed to replace those sums dollar-for-dollar (totaling $196 million)—as and when the sums had been removed—with borrowed money in order to support the Platform investments.  If Prophecy hadn't secretly borrowed this money, Prophecy would have been forced to shrink its Platform by removing sub-advisors, and it would have quickly become clear to those sub-advisors on the Platform, and to Plaintiffs, that Prophecy's capital had been lost, redeemed or plundered.  Any of those eventualities would have collapsed Prophecy's Funds and taken with it Kahn's funding source and his control over his investments.

116.    The consequence of so much leverage being added was that it left only $131 million ($363M-$196M-$36M=$131M) of fund capital supporting the $500+ million of investments on Prophecy's Platform.  These numbers imply a nearly 4:1 leverage ratio, which for a 'conservative investment' is very high.  This amount of leverage, in combination with the

Kahn's extraction of capital fundamentally altered the Funds' risk profile, making it far riskier than was represented to Plaintiffs, and far riskier than Plaintiffs would have accepted. The reports that Prophecy sent to Plaintiffs on a monthly basis grossly under-represented the Funds' leverage.

117.    Due to Plaintiffs' redemptions totaling over $50 million, Prophecy would have been required to reduce the small amount of capital that had been left undistributed to Kahn (from $131 million to approximately $81 million) and, in so doing, collapse its Platform business. Further, Kahn is unwilling or unable to return the Prophecy money tied up in FRG. The combination of capital sucked from the Funds by Kahn and replaced with leverage to support the Platform rendered Prophecy unable to fulfill Plaintiffs' redemption requests.

### J.    Prophecy Reveals That Its Auditor Had Resigned

118.    On March 31, 2020, Prophecy sent a letter to all its investors disclosing that Deloitte & Touche LLP ("Deloitte") had withdrawn its audit opinion for Prophecy's 2018 financial statements and resigned as auditor of the Funds almost two weeks earlier on March 18. The significance of Deloitte's resignation cannot be overstated: the withdrawal of an auditor's opinion combined with its resignation is extremely rare, often portends underlying fraud; it typically results only from a complete lack of confidence in the integrity and representations of fund management, such that the auditor can no longer trust the information provided for its audit. Deloitte's withdrawal of its audit opinion for the prior year's financial statements also meant that investors could no longer rely on the information that had been presented to them—suggesting that Prophecy misled both its auditors and its investors in the prior financial statements.

119.    Prophecy's 2018 audited financial statements, which were issued in June 2019, were clearly misleading in light of information that LyonRoss subsequently learned about

Prophecy's investment in the Broad Reach investment fund.  Notes to the financial statements represented that Prophecy had "invested into Funds and redeemed the same at the end of the year.  These redemptions were collected."  That statement was untrue when made in June 2019: as set forth above, Prophecy had in fact not collected $17.5 million in redemptions owed by Broad Reach.

**K.    Prophecy Improperly Suspends Redemptions**

120.    Prophecy's March 31 letter concluded with more bad news: Prophecy stated that it was *retroactively* suspending redemptions, effective March 30, 2020.  Despite these dire circumstances, Prophecy insisted that "patience" was required in order to avoid liquidating assets at price levels that would be "to the severe detriment of our investors."

121.    Prophecy's attempt to suspend redemptions on March 31 was ineffective because (i) LyonRoss had made an initial redemption request of $10 million in December 2019 (prior to discovery of the fraud), which should have been paid out in full by March 30, using a NAV calculated as of the Redemption Date of February 28, and there is no provision in the PPM or elsewhere granting Prophecy the right to suspend redemptions retroactively; and (ii) the suspension notice was delivered to Plaintiffs after close of business on March 31, which was the Redemption Date for Plaintiffs' second redemption request of $43,612,215 made in January 2020, and the suspension notice was therefore untimely.

122.    The information about the Funds' assets subsequently provided by Prophecy to all its investors leaves no room for doubt: the Funds are in dire straits, and its remaining assets are sunk heavily into Kahn's illiquid and highly leveraged investment schemes.  It is now entirely clear that Prophecy's statements about its "risk mitigation strategy" and cautious investment approach were utter fabrications—instead of investing in liquid equities managed by a diverse

group of sub-advisors, Prophecy has heavily concentrated its investors' money in a set of opaque, illiquid, leveraged and high-risk investments managed by Kahn.

123.    Whatever the scheme cooked up between them, Prophecy still has not disclosed its full relationship with Kahn.  Indeed, to date, Prophecy has not provided financials for the Funds for 2018 and 2019 and has not provided information establishing the Funds' NAV since January 2020.

124.    Prophecy and Kahn have apparently now turned on each other, asserting claims and counterclaims against one another in arbitration.  Kahn still enjoys the money taken from Prophecy and remains the beneficial owner or 15.3 million shares in FRG worth over $380 million (as of August 3, 2020).  Plaintiffs have received nothing.

## CAUSES OF ACTION

### COUNT I

**(Against the Prophecy Defendants for Violations of Section 10(b) of the Securities
Exchange Act of 1934 and Rule 10b-5 thereunder)**

125.    Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of

the preceding paragraphs of this Complaint.

126.    This claim is brought on behalf of all Plaintiffs against the Prophecy Defendants.

127.    The Prophecy Defendants knowingly, or recklessly, made false and/or misleading

material statements and omissions of material fact to Plaintiffs prior to Plaintiffs' various

investments in the Fund throughout 2019, for the purpose of inducing Plaintiffs to invest in the

Fund.

128.    The Prophecy Defendants' material misrepresentations included, *inter alia*, the

following:

      (a)    The Prophecy Defendants' claims, made by Spotts, Hughes and Caruso, to

LyonRoss personnel, including Piers Playfair ("Playfair"), Bliss and Bing Xu

("Xu"), during Plaintiffs' due diligence between August 2018 and February 2019,

that the principles of the Funds' management were (i) liquidity, (ii) diversification

(among both sub-advisors and positions), and (iii) risk-controls, and that the

Funds were stable and highly collateralized investment vehicles.

      (b)    The Prophecy Defendants' claim made by Spotts, Hughes and Caruso, to

LyonRoss personnel, including Playfair, Bliss and Xu, during Plaintiffs' due

diligence between August 2018 and February 2019, that Prophecy employed strict

risk control measures, including a requirement that sub-advisors trade through its

Platform, which allowed Prophecy to monitor its managers' trading strategies and, if necessary, directly liquidate holdings in each manager's account.

(c)     The Prophecy Defendants' claim, made by Spotts, Hughes and Caruso, to LyonRoss personnel, including Playfair, Bliss and Xu, during Plaintiffs' due diligence between August 2018 and February 2019, that Prophecy had the ability to prevent each sub-advisor on the Platform from executing risky trades that could exhaust its collateral with Prophecy.

(d)     The Prophecy Defendants' claim in the Fund's DDQ that, "[a]lmost all positions across the [F]und[s] can be liquidated in less than a day without significantly impacting prices."

(e)     The Prophecy Defendants' claim in their DDQ that their investment strategy involved providing capital to a "diverse" set of sub-advisors that trade exclusively in liquid assets, such as "listed US equities, liquid global equities and options."

(f)     The Prophecy Defendants' claim in their DDQ that "[t]he firm assets are deployed via sub-advisor in discretionary and systematic management strategies, *in liquid equity markets* on a long/short basis."  (Emphasis added.)

(g)     The Prophecy Defendants' claim in their DDQ that they are "interested in strategies that are process driven, that *traffic in liquid equities*, that have a record of *acceptable downside volatility and exposure*, and that are *consistently profitable*."  (Emphasis added.)

(h)     The Prophecy Defendants' claim in their DDQ that they "monitor strategies [of its sub-advisors] to ensure they remain diversified across the

-34-

aggregate of the funds positions" and that they would only engage sub-advisors that "have a clearly defined strategy that fits within the overall framework of the fund."

(i)      The Prophecy Defendants' claim in their DDQ that sub-advisors' allocations "are ***supported by cash deposits*** provided by each sub-advisor or third-party investor" which "serve as the primary downside risk protection for the fund." (Emphasis added.)

(j)      The Prophecy Defendants' claim in their DDQ that they "onboard strategies that invest in only the most liquid securities."

(k)      The Prophecy Defendants' claim in their DDQ that "Sub-advisor positions are mostly in liquid markets.  Almost all positions across the fund can be liquidated in less than a day without significantly impacting prices.  Prophecy maintains liquidity restrictions for all sub-advisors.  Should the liquidity of a market change, they would be required to reduce exposure on the affected position."

(l)      The Prophecy Defendants' claim in their DDQ that Prophecy's "dedicated risk operation monitors all trading activity through the EMS systems [i.e., the Platform, or "execution management system"] to ensure that sub-advisors do not exceed their trading allocation parameters.  These allocation parameters are hard-coded into the EMS and will prevent any subadvisor from entering an order that violates the settings."

(m)     The Prophecy Defendants' claim in their DDQ that their "risk operation monitors all trading in a real-time risk system that captures all activity, calculates profit and loss, and enables the performance of stress tests on positions."

(n)     The Prophecy Defendants' claim, made by Spotts on a September 7, 2018 call with Bliss, Xu , and Mike Handelman ("Handelman") of LyonRoss, that, "*All* [Prophecy's sub-] managers have to use Prophecy's order management system." (Emphasis added.)

(o)     The Prophecy Defendants' claim, made by Spotts and Caruso, during the October 5, 2018 webinar, attended by Bliss, Xu, and Handleman that maximum position value is generally no greater than 8% of subaccount allocation.

(p)     The Prophecy Defendants' claim, made by Spotts and Caruso, during the October 5, 2018 webinar that "Prophecy monitors the sub-account strategies to ensure they remain diversified across the aggregate of the Fund's positions."

(q)     The Prophecy Defendants' claim, made by Spotts and Caruso, during the October 5, 2018 webinar that "[i]f an individual sub-advisor's portfolio violates a daily stop-loss limit or if the collateral deposit amount declines to an unacceptable level, the portfolio may be liquidated."

(r)     The Prophecy Defendants' claim, made by Spotts and Caruso, during the October 5, 2018 webinar that "the Prophecy risk operation would hedge any significant exposure for individual positions" and that the Funds would employ "2-3x leverage."

(s)     The Prophecy Defendants' claim, made by Spotts on a November 26, 2018 call with Bliss, Xu, and Handelman of LyonRoss, that Prophecy lent money

to sub-advisors to make Off-platform investments only when they did not have the operational capability to manage certain strategies through their Platform.

(t)     The Prophecy Defendants' claim, made by Spotts on a November 26, 2018 call with Bliss, Xu, and Handelman of LyonRoss, that Prophecy offset its reduced ability to control risk in Off-platform positions by receiving full position-level transparency into the underlying securities being traded.

(u)     The Prophecy Defendants' claim, made by Spotts on a November 26, 2018 call with Bliss, Xu, and Handelman of LyonRoss, that Off-platform positions were all low-risk trading strategies with limited downside.

(v)     The Prophecy Defendants' claim, made by Spotts on a November 26, 2018 call with Bliss, Xu, and Handelman of LyonRoss, that Off-platform positions constituted less than 5% of the Funds' gross assets.

(w)     The Prophecy Defendants' claim, made by Spotts on a November 26, 2018 call with Bliss, Xu, and Handelman of LyonRoss, that the Funds' Off-platform positions did not include any commingled funds or limited partnerships, which are inherently less liquid and lack transparency.

(x)     The Prophecy Defendants' claim, made by Spotts on a December 7, 2018 call with Bliss of LyonRoss, that Off-platform investments represented less than 5% of the Funds' gross assets, that Prophecy had "full position level transparency" into its Off-platform investments, and that it only made such investments in strategies with "arbitrage-like qualities and low downside."

(y)     The Prophecy Defendants' claim, made by Spotts and Caruso, during the January 11, 2019 due diligence meeting with Bliss and Xu of LyonRoss that the

sub-advisor with a larger allocation than the others had sufficient cash deposited as collateral for any losses on his investments, which were all managed on Prophecy's Platform, that this sub-advisor was well-diversified because he employed other managers beneath him (later confirming that the sub-advisor's allocation included six strategies managed by traders he selected, and that allocations to his account would be decreasing over time to avoid concentration).

(z)     The February 2019 report provided by Spotts that misleadingly showed that Kahn managed a diversified, well-hedged portfolio.

(aa)    The Fund's representation in the Subscription Agreement and PPM that any investor could redeem its shares of the Fund in full on 60 days' notice.

(bb)    The Prophecy Defendants' mischaracterizations, made by Spotts, during calls with Bliss, Xu and/or others from LyonRoss on July 25, 2019, November 15, 2019, and December 17, 2019 of the nature of Prophecy's Off-platform exposure, falsely making it sound risk-controlled and generally consistent with its professed investment strategy.

(cc)    The Prophecy Defendants' statements, made by Spotts, in an August 27, 2019 email and on an August 28, 2019 call with Bliss and Xu of LyonRoss to the effect that Prophecy had not invested in the Broad Reach fund that turned out to be a Ponzi scheme.

(dd)    The Prophecy Defendants' claim, made by Spotts, on a November 15, 2019 call with Xu, Handelman, and John Carlson ("Carlson") of LyonRoss that Prophecy had fully redeemed the Broad Reach investment at year-end 2018.

(ee)   The Prophecy Defendants' representations, made by Spotts and Hughes, at a December 5, 2019 meeting in New York to Bliss and Xu of LyonRoss that the Funds' redemption from Broad Reach had been paid in full by April 2019.

(ff)   The Prophecy Defendants' representations, made by Spotts, on monthly calls with Bliss, Xu and/or others at LyonRoss that the Funds' investments were consistent with Prophecy's purported diversification and liquidity goals.

129.   As described above, these representations were false at the time they were made. *Inter alia*, the Prophecy Defendants had no intention of managing the Funds as represented, because they already had not been doing so.

130.   The Prophecy Defendants' material omissions included, *inter alia*, that:

(a)   Prophecy had a years-long pattern of making and concealing illiquid investments and hidden soft loans with undisclosed parties in direct contravention of its investment mandate.

(b)   Before and during Plaintiffs' investments in the Funds, the Prophecy Defendants had secretly transferred significant capital into an opaque investment fund managed by Broad Reach, which turned out to be a Ponzi scheme, and into soft loans with one sub-adviser, now known to be Kahn.

(c)   Spotts and Hughes had a longstanding and close relationship with Brenda Smith, the principal of Broad Reach.  Smith had helped Spotts and Hughes set up a different Prophecy fund and had served as an officer of that fund.

(d)   The Funds had a broad relationship with Brenda Smith and Broad Reach beyond one specific transaction.

(e)     The Prophecy Defendants did not have transparency into the Broad Reach investment fund.

(f)     Prophecy had made an Off-platform investment in the Broad Reach investment fund in January 2017 and hid it from its own investors by window dressing over two year ends, 2017 and 2018.

(g)     Prophecy had not been able to redeem most of the Funds' Broad Reach investment at the end of 2018 and had sold for full value and backdated a receivable for the unpaid portion to Kahn.

(h)     Prophecy had a longstanding practice of making undisclosed Off-platform soft loans and illiquid, opaque fund participations that violated its professed investment approach and specific representations to Plaintiffs.  The Prophecy Defendants made attempts to conceal the true character of the investments by redeeming them at year-end and then re-instating them in the new financial year. Prophecy had been making undisclosed soft loans to Kahn for years, redeeming them shortly before the end of each fiscal year and then reinstating them.

(i)     During 2018, while Plaintiffs' due diligence was ongoing, the Funds had made $46 million in loans to Kahn that were undisclosed when Plaintiffs decided to invest.

(j)     During 2018, while Plaintiffs' due diligence was ongoing, the Funds held an undisclosed $24 million investment in the Broad Reach fund, into which Prophecy had no "position level transparency" at all.

(k)     Of the Funds' $363 million of capital as of January 2020, Khan and Prophecy together, during the course of 2019, had syphoned $160 million into a

-40-

fully hidden side account and $36 million into other hidden loans to Kahn. These facts were omitted from Prophecy's reports to Plaintiffs that purported to disclose all of Prophecy's positions.

(l)     Eventually, 86% of the Funds' capital was at Kahn's disposal, most of it—$196 million—completely hidden from Plaintiffs. Kahn had used the majority of these funds to accumulate his highly concentrated, illiquid position in FRG stock.

(m)     Kahn held additional concentrated and illiquid positions purchased with the Funds' capital in addition to FRG.

(n)     The Funds' investments were overly concentrated in contravention of the Funds' guidelines.

(o)     The Funds were secretly over-leveraged to conceal their undisclosed Off-platform positions with Kahn. Prophecy replaced the secret $196 million allocation to Kahn, dollar-for-dollar, with covert leverage.

131.     Each of the foregoing misrepresentations and omissions were material and would have been important to the investment decisions of a reasonable investor.

132.     The Prophecy Defendants had a duty to disclose material information, such as the magnitude and illiquidity of Defendant Kahn's investments, because they owed Plaintiffs duties of care and loyalty with respect to the management of the capital Plaintiffs entrusted to them. Defendant Spotts owed a fiduciary duty to Plaintiffs as a director of the Fund. Defendants Spotts and Hughes further owed a fiduciary duty to Plaintiffs as a result of their role as the principals of Prophecy and the General Partner. Defendant Caruso owed a fiduciary duty to Plaintiffs as Prophecy's chief risk officer. These Defendants further had a duty to not tell half-truths and to

supply information necessary to make the statements they had made, and upon which they knew Plaintiffs were relying, not misleading.

133.    The Prophecy Defendants made these false and/or misleading representations and omissions to Plaintiffs with actual knowledge of their falsity and/or reckless disregard for the truth at the time they were made.  Spotts and Hughes were principals of Prophecy and operated the Fund.  Caruso was Prophecy's chief risk officer.  They had access to Prophecy's information systems and records and were well aware, *inter alia,* of the allocation of the Funds' capital to the Funds' sub-advisors because they themselves made them or were involved in making them. Each of the Prophecy Defendants also knew the disposition of the Fund's Off-platform and Platform investments by Kahn and Broad Reach or were reckless in not knowing them.  Each of the Prophecy Defendants had a duty to monitor the disposition of all of the Fund's Off-platform and Platform investments.  The Prophecy Defendants' scienter, knowledge, recklessness and intent to deceive are evidenced by, *inter alia*:

(a)     Their actual knowledge that the Funds had invested in the Broad Reach investment fund, in contravention of their investment mandate;

(b)     Their actual knowledge that they did not have transparency into Broad Reach's positions, and recklessness in not knowing what its positions were, including knowledge that Prophecy had not received audited financials from Broad Reach for two years prior to 2018.

(c)     Their actual knowledge, prior to February 2019, that Broad Reach had assets in the $30-$40 million range and therefore that Prophecy's representations about its conducting arbitrage-like options strategy were false;

(d)     Spotts's false denial of having invested in the Broad Reach fund;

-42-

(e)     The Prophecy Defendants' conspiring with Kahn to conceal the Funds' uncollected receivable from Broad Reach;

(f)     The Prophecy Defendants' actual knowledge of enormous, undisclosed Off-platform positions with Kahn;

(g)     The Prophecy Defendant's provision of patently false reports, including, notably, the January 17, 2020 position report, falsely purporting to show 100% of the Funds' assets and falsely showing that less than 10% of the Funds' assets were Off-platform.

(h)     Hughes's admission that these positions had not been disclosed.

(i)     Hughes's blaming Spotts for the undisclosed positions.

(j)     Caruso's telling another prospective investor that Prophecy was positioned to trade in and out of positions as needed to preserve capital and avoid losses, when that was patently false.

134.    The Prophecy Defendants made these material misrepresentations or omitted to disclose the material facts with the intention of inducing Plaintiffs, in reliance thereon, to make investments in the Funds and to retain those investments.

135.    Plaintiffs reasonably and justifiably relied on these misstatements and omissions in deciding to purchase securities in the form of shares of the Fund.  Several of Defendants' misrepresentations were recited in LyonRoss's investment memorandum, the document through which LyonRoss sought and was granted authority to invest with Prophecy by its investment committee.  During the pre-investment phase, LyonRoss vetted Prophecy's representations by conducting third-party research into the Funds and calling numerous service providers, references and peer firms to corroborate Prophecy's reputation and representations.  The

documents Prophecy provided to Plaintiffs, including monthly reports, and numerous oral communications prior to January 2020, including monthly status calls, were consistent with the diversified, liquid strategies Prophecy claimed to be pursuing.  Spotts and Hughes plausibly explained any minor deviations from their professed investment procedure and couched such deviations with assurances of appropriate risk-controls, small size of such positions or both. Plaintiffs discovered the truth only through vigilant diligence, and the Prophecy Defendants' eventual ineptitude in continuing to conceal their deception.

136.    By virtue of the foregoing, the Prophecy Defendants violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder in that they, directly or indirectly, by use of the means or instrumentalities of interstate commerce and/or the mails, or of a facility of a national securities exchange, knowingly or recklessly employed devices, schemes, and artifices to defraud, made untrue statements of material facts or omitted to state facts that they were under a duty to speak, and engaged in acts of fraud and deceit upon Plaintiffs, all in connection with the purchase or sale of securities.

137.    Each of the Plaintiffs was harmed by the wrongful conduct of the Prophecy Defendants.

138.    As a direct and proximate result of the Prophecy Defendants' material misrepresentations and omissions, Plaintiffs have lost tens of millions of dollars that the Prophecy Defendants refuse to return.  The Prophecy Defendants' pattern of repeated misrepresentations and omission concerning the Funds' Off-platform investments and their investments with Kahn, directly led to the loss of the value of their investments and their inability to redeem them due to concentration, illiquidity and over-leverage in the Funds, and losses and illiquidity directly due to Kahn's positions.  Indeed, Kahn has either refused, or is

unable, to return Plaintiffs' capital diverted from the Funds and now tied up in FRG stock.

Plaintiffs are therefore entitled to damages in an amount to be determined at trial.

## COUNT II

### (Against Prophecy, the General Partner, Spotts, and Hughes for Violations of Section 20(a) of the Securities Exchange Act of 1934)

139.    Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

140.    This claim is brought on behalf of all Plaintiffs against Defendants Prophecy, the General Partner, Spotts, and Hughes.

141.    As alleged more fully above, the conduct of the Prophecy Defendants violated Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder.

142.    Prophecy serves as the investment manager for the Fund and the Master Fund, and the General Partner serves as the general partner for the Master Fund.  In such capacities, Prophecy and the General Partner act as agents of the Fund and the Master Fund, and conducted and participated, directly and indirectly, in the conduct of the business affairs of the Fund and the Master Fund.  Prophecy and the General Partner had the power, both direct and indirect, to control the Fund and the Master Fund, did in fact exercise such control and were therefore controlling "person[s]" within the meaning of Section 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78(t)).

143.    Defendants Spotts and Hughes participated in the operation and management of the Prophecy Defendants, including the Fund and the Master Fund, and conducted and participated, directly and indirectly, in the conduct of the Prophecy Defendants' business affairs. Defendants Spotts and Hughes had the power, both direct and indirect, to control the Prophecy

Defendants, did in fact exercise such control and were therefore controlling "person[s]" within the meaning of Section 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78(t)).  To that end, for example, Defendant Spotts is a director of the Fund, and Defendants Spotts and Hughes are principals of Prophecy and the General Partner, which act as agents of the Fund and the Master Fund.

144.    As described above, Prophecy, the General Partner, Spotts, and Hughes were culpable participants in the violation of Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder.

145.   By reason of the foregoing, Plaintiffs have sustained damages in an amount to be proven at trial.

**COUNT III**

**(Against the Prophecy Defendants for Common Law Fraud)**

146.    Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

147.    This claim is brought on behalf of all Plaintiffs against the Prophecy Defendants.

148.    The Prophecy Defendants knowingly, or recklessly, made false and/or misleading material statements and omissions to Plaintiffs prior to Plaintiffs' investments in the Fund, for the purpose of inducing Plaintiffs to invest in the Fund.

149.    In connection with their fraudulent scheme, the Prophecy Defendants continued to disseminate false and/or misleading statements and omissions to the Plaintiffs after Plaintiffs made their investments for the purpose of concealing the truth to induce Plaintiffs, in reliance on the false statement and omissions, to retain their investment interests in the Fund.

150.    The Prophecy Defendants' misrepresentations included those listed in paragraph 128.

151.   The Prophecy Defendants' omissions included those listed in paragraph 130.

152.   The Prophecy Defendants had a duty to disclose material omissions such as the magnitude and illiquidity of Defendant Kahn's investments because they owe Plaintiffs duties of care and loyalty with respect to the management of the capital Plaintiffs entrusted to them. Defendant Spotts owes a fiduciary duty to Plaintiffs as a director of the Fund. Defendants Spotts and Hughes further owe a fiduciary duty to Plaintiffs as a result of their role as the principals of Prophecy and the General Partner. Defendant Caruso owes Plaintiffs a fiduciary duty as the chief risk officer of Prophecy. The Defendants further had a duty to not tell half-truths and to supply information necessary to make statements they had made not misleading. Finally, the Prophecy Defendants had a duty to disclose material omissions because they had superior and peculiar knowledge not available to Plaintiffs.

153.   The Prophecy Defendants intended to defraud Plaintiffs. They made the false and/or misleading representations and omissions listed in paragraphs 128 and 130 to Plaintiffs with actual knowledge of their falsity and/or reckless disregard for the truth at the time they were made, as alleged above. Spotts and Hughes were principals of Prophecy and operated the Funds. Caruso was Prophecy's chief risk officer. They were well aware of the investments made by the Funds' sub-advisors, including Kahn. Spotts, Hughes, and Caruso knowingly misrepresented the nature of these investments to Plaintiffs. At the January 28, 2020 meeting, LyonRoss caught Hughes with a report inconsistent with the one Prophecy had provided to Plaintiffs. This report showed some of Kahn's previously concealed off-platform investments. When pressed, Hughes admitted that Kahn had received $196 million in additional off-platform capital. On the same day, Bliss saw previously concealed, large illiquid positions on Caruso's computer screen.

154.    Plaintiffs reasonably and justifiably relied on these misstatements and/or omissions in deciding to invest in the Fund, and in maintaining their investments as shareholders. Some of Defendants' misrepresentations were recited in LyonRoss's investment memorandum, the document through which LyonRoss sought and was granted authority to invest with Prophecy by its investment committee. During the pre-investment phase, LyonRoss vetted the Prophecy Defendants' representations by conducting third-party research into the Funds and calling numerous service providers, references and peer firms to corroborate Prophecy's reputation and representations. Plaintiffs could not have known that the Prophecy Defendants' representations were false, as the Prophecy Defendants concealed the truth during Plaintiffs' due diligence and thereafter. The documents Prophecy provided to Plaintiffs, including monthly reports, were consistent with the diversified, liquid strategies the Prophecy Defendants claimed to be pursuing. Spotts and Hughes plausibly explained any minor deviations from their normal process, such as the purportedly small investments that they claimed were Off-platform for operational reasons. Plaintiffs discovered the truth through vigilant diligence, and by pressing the Prophecy Defendants until the fraud came out.

155.    If Plaintiffs had known the truth, they would not have made their investments in the Fund, would not have continued to invest in the Fund, and would have redeemed their investments.

156.    By virtue of the foregoing, the Prophecy Defendants have committed fraud.

157.    The fraudulent conduct of Prophecy Defendants, as outlined above, was committed purposefully, knowingly, recklessly and without regard for the rights and interests of Plaintiffs.

158.    As a direct and proximate result of the Prophecy Defendants' material misrepresentations and omissions, Plaintiffs have found their capital invested in far riskier and less liquid investments than they otherwise would have chosen and have been denied the ability to redeem their investments.  Plaintiffs are therefore entitled to damages in an amount to be determined at trial.

## COUNT IV

### (Against The Prophecy Defendants for Negligent Misrepresentation)

159.    Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

160.    This claim is brought on behalf of all Plaintiffs against the Prophecy Defendants.

161.    When providing Plaintiffs with information relating to the nature of the Funds' investments, the Prophecy Defendants were engaged in the course of their business.

162.    The Prophecy Defendants, owed duties of care and loyalty to Plaintiffs because Plaintiffs had entrusted their capital to them, and reposed trust and confidence in them.  The Prophecy Defendants accepted Plaintiffs' trust and confidence, forming a fiduciary relationship.

163.    In connection with Plaintiffs' consideration of the Fund, these Defendants provided false and/or misleading information, or caused such false and/or misleading information to be provided, both before Plaintiffs purchased shares in the Fund and later, once Plaintiffs became shareholders, for the purpose of keeping Plaintiffs as shareholders in the Fund.

164.    The Prophecy Defendants intended Plaintiffs to rely upon the false and/or misleading information in deciding whether to invest, or remain in, the Fund.

165.    The Prophecy Defendants failed to exercise reasonable care or competence in obtaining or communicating the information supplied to Plaintiffs.  Defendants acted negligently and carelessly.

166.    Plaintiffs justifiably relied upon the information supplied by the Prophecy Defendants in deciding to make and retain their investments in the Fund, and suffered harm as a result.  Plaintiffs could not have known that the Prophecy Defendants' representations were false, as the Prophecy Defendants concealed the truth during Plaintiffs' due diligence and thereafter.

167.    If Plaintiffs had known the truth, they would not have made their investments in the Fund, would not have continued to invest in the Fund, and would have redeemed their investments.

168.    As a direct and proximate result of the conduct of the Prophecy Defendants Plaintiffs have sustained damages in an amount to be proven at trial.

## COUNT V

### (Against Defendants Kahn, Hughes, and Caruso for Aiding and Abetting Common Law Fraud)

169.    Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

170.    This claim is brought on behalf of all Plaintiffs against Defendants Kahn, Hughes, and Caruso.

171.    Defendants Kahn, Hughes, and Caruso played a significant and vital role in the fraudulent scheme alleged herein, with knowledge thereof.

172.    As a longstanding sub-advisor to the Funds, Defendant Kahn had actual knowledge that the Prophecy Defendants knowingly, or recklessly, made materially false and/or misleading statements and omissions to Plaintiffs prior to Plaintiffs' investment in the Fund, for the purpose of inducing Plaintiffs to invest in the Fund, and during Plaintiffs' investment in the

Fund, for the purpose of inducing them to maintain their investments. Kahn's actual knowledge of the underlying fraud is evidenced by, *inter alia* the following:

     (a)    Kahn had acted as a sub-advisor for Prophecy since the beginning of the Funds, and he was consistently the Prophecy sub-advisor with the largest allocation.

     (b)    Kahn also had a longstanding and close relationship with Prophecy and with Spotts, who described Kahn as being "like a brother" to him.

     (c)    Due, *inter alia*, to his position as the largest sub-advisor and his multi-year relationship with Prophecy, Kahn was well aware of the Funds' purported strategy and how they were marketed to investors. For instance, he knew that Prophecy's website stated that its strategy was "to obtain consistent absolute returns primarily through capital appreciation, while preserving capital and mitigating risk," which necessarily indicates that its allocations would be in liquid securities.

     (d)    Further, although Prophecy's sub-advisors' general agreement specified that no position in a stock would exceed its average daily trading volume by more than 15%, Kahn's FRG position purchased with Prophecy money was orders of magnitude more than FRG's average trading volume.

     (e)    Kahn paid full value for Prophecy's defaulted redemption rights owed by Broad Reach—a transaction that made no economic sense—and agreed to backdate the transaction.

     (f)    On January 18, 2020—just one week before the in-person meeting where LyonRoss discovered Prophecy's secret side account with Kahn and its hidden soft loans to Kahn—Kahn spoke to LyonRoss and Spotts by phone. During that call, Kahn

admitted that he had purchased the Broad Reach receivable with his personal money, but he said nothing about his huge, illiquid position in FRG.

      (g)    Kahn was a counterparty to the Funds' redemptions and reinstatements of loans to him over the year ends 2017 and 2018, and was aware that such behavior would be opaque to Prophecy investors.

      (h)    Kahn knew it would have been virtually impossible to raise sufficient funds, of this kind, in the market for the speculative investments he made using money from the Funds.

173.    Kahn substantially assisted the Prophecy Defendants' fraud.  As described above, Kahn was instrumental both in making the investments that the other Defendants fraudulently concealed from Plaintiffs and in helping the other Defendants to conceal those investments and the Fund's loss relating to Broad Reach.  He purchased the Broad Reach receivable at full value and admitted that he then provided a release to LyonRoss, to "keep [Plaintiffs] in the Fund."

174.    Defendants Hughes and Caruso also knew that the other Prophecy Defendants and Spotts were defrauding Plaintiffs.  Hughes, as a principal of Prophecy, and Caruso, as Prophecy's chief risk officer, were well aware of the investments made by Prophecy's sub-advisors and of the representations the Prophecy Defendants and Spotts made to Plaintiffs.  Due to his position, Caruso was responsible for knowing and had a duty to monitor all of Prophecy's positions.  And indeed, he ran Prophecy's book of investments from a computer terminal with real time visibility and on every position, every sub-advisor and every trade executed on the Platform.  He knew how much capital was being allocated to each sub-advisor, the profits and losses of each sub-advisor, the allocation of the Plaintiff's capital to Kahn and the leverage being

used to fund the Platform investments.  Hughes and Caruso attended meetings with LyonRoss, including the January 28, 2020 meeting where the fraud was revealed.

175.    Hughes and Caruso substantially assisted the fraudulent conduct of the other Prophecy Defendants and Spotts.  They, *inter alia,* helped Spotts maintain the illusion of liquidity during calls and meetings with LyonRoss, and failed to correct false and misleading reports and statements made by Spotts.

176.    The fraudulent conduct of the other Prophecy Defendants and Spotts, as outlined above, and as aided and abetted by Kahn, Hughes, and Caruso, was committed purposefully, knowingly, recklessly, and without regard for the rights and interests of Plaintiffs.

177.    As a direct and proximate result of the conduct of Defendants Kahn, Hughes, and Caruso, Plaintiffs have sustained damages in an amount to be proven at trial.

**COUNT VI**

**(Against all Defendants for Civil Conspiracy to Commit Fraud)**

178.    Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

179.    This claim is brought on behalf of all Plaintiffs against all Defendants.

180.    As alleged above, the Prophecy Defendants committed acts of fraud by knowingly or recklessly making false and/or misleading statements and omissions to Plaintiffs in connection with Plaintiff's investments in the Fund.

181.    All Defendants agreed and conspired together to commit fraud and engage in a course of material misrepresentations and omissions to conceal the fraudulent acts.  Kahn and the Prophecy Defendants agreed that Kahn would invest the Funds' capital into Off-platform investments that would be concealed from investors, including Plaintiffs.  They further agreed that Kahn would purchase the Broad Reach receivable to conceal the Funds' losses from

Plaintiffs relating to Broad Reach and procure and offer a release from Kahn to the Funds, to induce Plaintiffs to maintain their investment.

182.    Defendants intentionally and knowingly committed overt acts in furtherance of this conspiracy, including by making the misrepresentations detailed above as well as Defendant Kahn's purchase of the Broad Reach receivable.

183.    As a direct and proximate result of Defendants' conduct, Plaintiffs have sustained damages in an amount to be proven at trial.

## COUNT VII

### (Against The Prophecy Defendants for Breach of Fiduciary Duty)

184.    Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

185.    This claim is brought on behalf of all Plaintiffs against the Prophecy Defendants.

186.    The Prophecy Defendants owed fiduciary obligations to Plaintiffs, including the duties of loyalty, good faith, candor and due care.  Defendant Spotts is one of only two directors of the Fund, and therefore owes a fiduciary duty to Plaintiffs as shareholders of the Fund. Defendants Spotts and Hughes further owe a fiduciary duty to Plaintiffs as a result of their role as the principals of Prophecy and the General Partner, which were responsible for managing the investments of the Master Fund and the Fund in which Plaintiffs invested.  Defendant Caruso owes a fiduciary duty to Plaintiffs as the chief risk officer of Prophecy.

187.    The Prophecy Defendants, owed duties of care and loyalty to Plaintiffs because Plaintiffs had entrusted their capital to them and reposed trust and confidence in them.  The Prophecy Defendants accepted Plaintiffs' trust and confidence, forming a fiduciary relationship.

188.    The Prophecy Defendants breached those duties and committed actual fraud by making repeated false and/or misleading statements and omissions to Plaintiffs regarding the

nature and liquidity of the Funds' investments, both before and during the course of their investments. These false and/or misleading statements and omissions were made specifically and uniquely to Plaintiffs in response to their specific inquiries for the purpose of keeping Plaintiffs in the Fund as shareholders by concealing the truth in violation of those Defendants' fiduciary duties.

189.    Moreover, the Prophecy Defendants caused the Funds to be managed in a manner that was inconsistent with the investment mandate for the Funds and their fiduciary duties towards Plaintiffs as investors in the Funds. Acting in their own self-interest and in knowing violation of, or reckless and bad-faith disregard of, the law, the Prophecy Defendants allowed or caused Plaintiffs' capital to become invested in highly concentrated and illiquid positions, contrary to the Funds' mandate to invest only in highly diversified and liquid positions. Defendants Prophecy, Spotts, Hughes, and Caruso therefore breached their fiduciary duties to Plaintiffs through their mismanagement of the Funds' investments.

190.    The Prophecy Defendants further owed a fiduciary duty to Plaintiffs to supervise the issuance and content of the Fund's offering documents, periodic reports and other statements to ensure that they were truthful and accurate and that such statements conformed to applicable securities laws. The Prophecy Defendants, however, breached their fiduciary duties by allowing the Fund to issue and disseminate statements that were materially false and/or misleading and failed to disclose material information.

191.    Plaintiffs were uniquely injured by Defendants Spotts, Hughes, and Caruso's breaches of fiduciary duty, insofar as the misstatements and omissions perpetrated by these Defendants caused Plaintiffs to remain as shareholders in the Fund and contributed directly to the injury they suffered.

192.     These wrongful acts of Spotts, Hughes and Caruso constitute actual fraud and/or willful default of all fiduciary duties owed to Plaintiffs.

193.     As a direct and proximate result of the Prophecy Defendants' conduct, Plaintiffs have sustained damages in an amount to be proven at trial.

<u>COUNT VIII</u>

**(Against Defendant Kahn for Aiding and Abetting Breach of Fiduciary Duty)**

194.     Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

195.     This claim is brought on behalf of all Plaintiffs against Defendant Kahn.

196.     Defendant Kahn knew that the Prophecy Defendants owed fiduciary obligations to Plaintiffs with respect to the management of the capital entrusted to the Prophecy Defendants, including the duties of loyalty, good faith, candor and due care.

197.     Based on his role in the scheme, Defendant Kahn knew that the Prophecy Defendants were breaching those duties, through the conduct described above.

198.     Defendant Kahn substantially assisted such breach of fiduciary duties by investing the Funds' capital in illiquid, concentrated holdings contrary to the representations made to Plaintiffs, and by helping Prophecy cover up the Broad Reach transaction, including providing a release in order to keep LyonRoss in the Fund.

199.     As a direct and proximate result of Defendant Kahn's conduct, Plaintiffs have sustained damages in an amount to be proven at trial.

**COUNT IX**

**(Against The Fund for Breach of Contract)**

200.     Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

201.    This claim is brought on behalf of all Plaintiffs against the Fund.

202.    Each Plaintiff entered into a Subscription Agreement with the Fund in connection with their investments in the Fund.  The Subscription Agreements incorporated by reference the PPM of the Fund and, collectively, the Subscription Agreements and the PPM formed the contracts between each Plaintiff and the Fund.

203.    Plaintiffs, as shareholders in the Fund, had a contractual right to redeem their interests in the Fund at their election.  According to the PPM that was incorporated into the Subscription Agreement that each of the Plaintiffs signed:  "Shareholder may redeem all or any portion of its Shares on the last calendar day of each month . . . by providing 60 calendar days' written notice . . . before the applicable Redemption Date."

204.    The PPM further provides that "[s]hares will be redeemed at the Redemption Price as of the close of business on the applicable Redemption Date," and that such a redemption "shall be paid within 30 calendar days after the applicable Redemption Date." *Id.* at 12–13.  The Redemption Price is calculated by reference to net asset value ("NAV") of the redeeming party's shares.  According to the PPM, the NAV is calculated "in accordance with GAAP" accounting principles at the end of each month.

205.    On December 24, 2019, LyonRoss had requested a redemption of $10 million on behalf of the LyonRoss Partners Fund (effective February 28, 2020).  (This initial redemption request had already been made before the Funds' concentration or Off-platform investments with Kahn had come to light and under the belief that the Funds' assets were substantially liquid.)  In an email, Prophecy acknowledged receipt of the redemption request on January 6, and noted that, pursuant to the terms of the PPM, the Redemption Date for the request would be February 28,

2020.  According to the PPM, Prophecy had 30 calendar days from that date—until March 30, 2020—to pay the LyonRoss Partners Fund the full value of its redeemed shares.

206.     On January 31, 2020, immediately after learning of the Defendants' fraud, all Plaintiffs requested in writing from Prophecy a full redemption of their remaining shares. Pursuant to the terms set forth in the PPM, the Redemption Date for the January 2020 redemption request was March 31, 2020.  Prophecy was obligated to make payments to LyonRoss and its advisory clients within 30 calendar days of that date.  To date, no payment has been made as to either redemption request, both of which are due and owing.

207.     Plaintiffs performed all of their obligations under the Subscription Agreements and the PPM.

208.     These failures constitute material breaches of contractual provisions.

209.     As a direct and proximate result of Defendants' conduct, Plaintiffs have sustained damages in an amount to be proven at trial.

## COUNT X

**(Against Defendants Prophecy, Spotts, Hughes, and Caruso for Negligence)**

210.     Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

211.     Defendant Prophecy, as the investment manager of the Fund, and Defendants Spotts, Hughes, and Caruso, as the portfolio manager, president, and chief risk officer, respectively, of the Fund's manager, directly owed the highest duties of care and loyalty to Plaintiffs, who were investors in the Fund.

212.    Additionally, Prophecy, as an investment advisor registered with the SEC, owed professional duties of care to its clients, irrespective of any contractual duties, to exercise that degree of skill normally expected of investment advisers performing advisory services of the nature provided here.

213.    Plaintiffs reasonably and foreseeably relied on Prophecy to exercise such care as ordinarily exercised by an experienced investment manager in managing the Fund.  Likewise, Plaintiffs reasonably and foreseeably relied on Spotts, Hughes, and Caruso to exercise such care as ordinarily exercised by experienced officers of an investment fund manager.

214.    Prophecy failed to act as a reasonably prudent investment fund manager by mismanaging the Fund in the manner described above, including but not limited to, allowing or causing Plaintiffs' capital to become invested in highly concentrated and illiquid positions, contrary to the Fund's mandate to invest only in highly diversified and liquid positions. Likewise, Spotts, Hughes, and Caruso, as officers of Prophecy, failed to act as reasonably prudent officers of an investment fund manager by causing or allowing the Fund to engage in the behavior described herein.

215.    In addition to the misrepresentations and omissions that caused Plaintiffs to invest and retain their investments in the Fund and therefore lose all of their investment capital, Defendants' mismanagement caused the Funds' capital to be tied up with Kahn's highly illiquid and concentrated holdings and thus, denied Plaintiffs the ability to redeem their investments in the Fund.

216.    As a direct and proximate result of Prophecy's, Spotts', Hughes', and Caruso's negligence, Plaintiffs have sustained damages in an amount to be determined at trial.

## COUNT XI

### (Against Defendant Kahn for Unjust Enrichment)

217.    Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

218.    Defendant Kahn was unjustly enriched at Plaintiffs' expense, in that he secretly, and contrary to Prophecy's representations to Plaintiffs, used Plaintiffs' capital to build up a huge interest in a company that he controls.

219.    Defendant Kahn had a relationship with Plaintiffs: he was aware of Plaintiffs, communicated with them directly, and admittedly provided a release in connection with the Broad Reach receivable purchase specifically to induce Plaintiffs to remain invested in the Fund.

220.    It is against equity and good conscience to permit Defendant Kahn to retain Plaintiffs' capital and the benefits of his use thereof because, *inter alia*, he conspired with the Prophecy Defendants to decieve Plaintiffs and misuse their capital.

221.    Accordingly, as Defendant Kahn's acts directly and proximately caused injury to Plaintiffs, Plaintiffs are entitled to the return of their capital and the value of any benefit Kahn received as a result of his unjust acts, in an amount to be determined at trial.

### <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs demand judgment from this Court awarding:

A.    Damages to all Plaintiffs against each of the Defendants, jointly and severally, in an amount to be determined at the trial of this action, but no less than the entire consideration paid by these Plaintiffs for their interests in the Fund;

B.    Punitive damages in an amount to be determined at the trial of this action;

C.    Interest on any award at the maximum allowable rate; and

D.     Such other relief as this Court deems just and proper to adequately compensate Plaintiffs.


Dated: August 24, 2020

SCHINDLER COHEN & HOCHMAN LLP

By:_____
    Jonathan L. Hochman
    Matthew A. Katz
    Anna Vinogradov
100 Wall Street, 15th Floor
New York, NY 10005
(212) 277-6300
(212) 277-6333 (fax)

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable, including liability and damages.

Dated: August 24, 2020

New York, New York

Respectfully submitted,

By: _____

*Attorneys for Plaintiffs*